## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**TERRI MEAGLEY**                                                                                    **PLAINTIFF**

**v.**                                    **Case No. 4:09-cv-226-DPM**

**CITY OF LITTLE ROCK**                                                          **DEFENDANT**


## MEMORANDUM OPINION AND ORDER

While crossing a bridge near the siamang exhibit on an electric scooter rented from the Little Rock Zoo, Terri Meagley was injured when the scooter turned over. Meagley sued the City of Little Rock. She pressed claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973.

The parties tried this case to the Court. Meagley moved at trial to amend her complaint to assert new claims raised by the proof. Without objection from the City, the Court granted the motion, conditioned on the City's right to offer some exhibits after trial on the new issues and both parties having the opportunity to file post-trial briefs.

The Court admits the new evidence from the City: Terri Branson's affidavit and the six exhibits attached to it. Exhibits one and two are copies of the forms the Zoo now uses when someone either brings their own scooter

to the Zoo or rents one there.  Both forms contain a liability waiver.  Exhibits three through six are copies of the signs the Zoo put up after Meagley's accident, which directed scooter users to an alternate path.  These signs were described by the witnesses at trial.  Meagley stipulated that the City could offer whatever additional exhibits it wanted.  These exhibits, and the parties' post-trial briefs, have helped the Court.

This Court has personal and subject matter jurisdiction.  Venue is proper.  The record is closed; and the case is ripe for decision.

## FINDINGS OF FACT

**1.**   Terri Meagley was and is disabled.  She has several medical problems, some of which limit her ability to walk very far.  At the time of the accident she weighed about three hundred pounds.

**2.**   On 17 June 2007, Meagley went to the Little Rock Zoo with her daughter, son-in-law, and grandchildren.  The Zoo is a service offered by Little Rock to the general public.  The City has received federal money for the Zoo and numerous city projects.

**3.** Meagley's son-in-law rented her an electric scooter from the Zoo. The scooter cost $20.00 for two hours and $5.00 for each additional hour.

**4.** As Meagley was starting to go over a bridge near the siamang[*] exhibit, her scooter tipped over.

**5.** An ambulance took Meagley to St. Vincent Hospital. She hurt her back and hips, and suffered bruised ribs. She was released from the hospital after a few hours. The parties dispute the severity of her injuries and which of her medical problems were caused by the accident. The Court need not and does not decide those factual disputes.

**6.** At the time of Meagley's accident, the Zoo's standard practice was for a guest services representative to inform the renter about the "dos and don'ts" of using a scooter. This information included an admonition to slow down when traveling over inclines and information about locations where scooter use was prohibited. The renter was also told to read the instructions on the scooter's front and back. No one from the Zoo testified that they, or a co-worker, gave Meagley or her son-in-law this information. Meagley testified that she received no such instruction. The Court believes her.

---

[*]Siamang are medium-sized primates native to Sumatra and Malaysia. Their coat is typically black. XV THE OXFORD ENGLISH DICTIONARY 404 (2d ed. 1989).

**7.**  No scooter had ever overturned on the bridge in question before Meagley's accident.  Within days of Meagley's accident, Zoo personnel blocked off the bridge.  The Zoo eventually reopened the bridge after putting up signs nearby that warned against using scooters on the bridge.  Several Zoo employees testified about the installation of these signs, both temporary and permanent.  The Court credits this testimony.  Meagley's former lawyer saw no signs at the bridge when he investigated the scene months after the accident.  A map admitted into evidence, Defendant's Exhibit 7, shows the signs on the paths to the bridge, not on the bridge itself.

**8.**  About a year after Meagley's accident, the United States Department of the Interior (through the United States Justice Department) received a complaint from Meagley's former lawyer.  The complaint alleged, in part, that the Zoo was not accessible to people with disabilities because of architectural barriers.  The Department of the Interior ordered the Zoo to conduct a self-evaluation.

**9.**  The Zoo hired the Renshaw Firm to do the evaluation.  The firm's report found, among other things, that two bridges near the siamang exhibit needed to be replaced because the slopes of bridges were too steep.  One of

those bridges was the bridge where Meagley's accident occurred.  The slope of the approach to that bridge was an incline of 18.3 degrees on the left side, 20.6 degrees in the center, and 22.1 degrees on the right side.

10.  The Zoo had undergone a previous evaluation in the late 1990s. Fred Chilcote, an architect, completed an accessibility study at the Zoo in connection with an ADA class-action against the City, *Coates v. City of Little Rock*.  Chilcote developed a transition plan for the Zoo, which listed things that the Zoo needed to fix to comply with the ADA.  Chilcote did not note any problems with the two bridges near the siamang exhibit.  The Zoo made all of the changes specified in the Chilcote report.

11.  Though he had suffered a stroke, Chilcote testified at trial.  The following exchange occurred on direct examination of Chilcote by Meagley's lawyer.

Q.    And you knew that that accessible route had to be designated, didn't you?

A.    Yes.

Q.    And you told the city that it had to be designated, didn't you?

A.    Yes.

This "designation of an accessible route" task is not in Chilcote's 1999 report.

**12.** The Zoo corrected all of the compliance issues listed in the Renshaw Firm's recent report.  In particular, the Zoo rebuilt the two bridges near the siamang exhibit.  They are now essentially level.  The Zoo completed this work on the bridges in May 2009.

**13.** In June 2009, the Department of the Interior concluded that the Zoo's scooters were safe.  Though the scooters are not to be used on inclines greater than 12 degrees, the Zoo's reconstruction of the two bridges eliminated any safety concerns.

**14.** The Zoo continues to monitor itself for ADA compliance and makes changes in its facilities when needed.

**15.** Sometime after Meagley's accident, the Zoo began having visitors who rent a scooter sign a release waiving tort claims.  Visitors who bring their own scooter must sign another, similar waiver.  Neither waiver covers ADA or Rehabilitation Act claims.  Meagley did not sign any waiver.

## CONCLUSIONS OF LAW

**16.** To prove a violation of section 504 of the Rehabilitation Act and Title II of the ADA, Meagley must establish: 1) she is a qualified individual with a disability; 2) she was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and 3) that this exclusion, denial of benefits, or other discrimination, was by reason of her disability. *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998); 29 U.S.C.A. § 794(a) (West 2008); 42 U.S.C.A. § 12132 (West 2005). There is one additional element Meagley must prove to establish a violation under the Rehabilitation Act: the public entity at issue must be receiving Federal financial assistance. 29 U.S.C.A. § 794(a); *Layton*, *supra*.

**17.** Meagley is a qualified individual with a disability. Meagley's mobility is significantly limited, and she must use some mobility aid to travel more than a short distance. The slope of the bridge where Meagley's scooter overturned exceeded the maximum slope allowed by the ADA Accessibility Guidelines. *See generally Parr v. L & L Drive-Inn Restaurant*, 96 F. Supp. 2d 1065, 1087 (D. Haw. 2000) (discussing slope guidelines). The scooter Meagley

rented from the Zoo was not meant to go over such a steep incline.  As a result, Meagley was not only denied full access to the Zoo (and the siamang exhibit in particular) but was also injured in the process.  It is undisputed that the City has received and continues to receive federal funds for the Zoo and other city programs.  Meagley has therefore established that the Zoo violated both section 504 of the Rehabilitation Act and Title II of the ADA.

**18.**  Meagley's claim for injunctive relief related to the bridge, however, is moot. Since her accident the Zoo has altered the once-noncompliant bridges so that they are now essentially flat.  Further, the Zoo continues to monitor and re-evaluate itself to ensure that its facilities are ADA compliant.  No injunctive relief is available based on the old bridges.

**19.**  Meagley's claim for injunctive relief related to signs designating an accessible route also fails as a matter of law.  First, the Court can find no basis in the ADA regulations or the cases obligating the Zoo to post signs marking an accessible path of travel from point to point.  The regulations do require signs highlighting certain facilities—parking, restrooms, entrances, and such. ADA Accessibility Guidelines for Buildings and Facilities §§ 4.1 & 4.30.  It was undisputed that the Zoo has these signs at appropriate places.  If part of a

facility is inaccessible this too must be noted with a sign.  ADA Accessibility Guidelines for Buildings and Facilities §§ 4.1 & 4.30.  The Zoo installed such signs at the bridges after Meagley's accident and before they were rebuilt. Second, the Court gives limited weight to Chilcote's testimony on this point. His stroke has somewhat impaired him.  For example, at trial he recognized Meagley's lawyer but could not speak his name.  The Court allowed leading questions; and almost all of Chilcote's answers were "yes" or "no" or "right." The Court concludes that Chilcote's testimony about a purported duty to designate a point-to-point accessible path of travel was his effort to testify about the Zoo's undisputed obligation to put signs up about accessible parking, restrooms, and entrances, as well as marking known inaccessible areas.  The Zoo fulfilled this obligation.  In particular, it marked the old bridges as inaccessible once it discovered the slope problem.

**20.**  Meagley's claim for compensatory damages also fails as a matter of law.  Damages are available in ADA/Rehabilitation Act cases.  *Rodgers v. Magnet Cove Public Schools*, 34 F.3d 642, 644–45 (8th Cir. 1994) (Richard S. Arnold, C.J.).  It is an open question in the Eighth Circuit, however, whether a  disabled  plaintiff  must  prove  discriminatory  intent  to  get  these

compensatory damages.  Authority from every other Circuit Court that has addressed the issue holds that discriminatory intent is required.  *Ferguson v. City of Phoenix*, 157 F.3d 668 (9th Cir. 1998); *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567 (5th Cir. 2002); *Barber ex rel. Barber v. Colorado Department of Revenue*, 562 F.3d 1222 (10th Cir. 2009); *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268 (2d Cir. 2009); *Wood v. President & Trustees of Spring Hill College in City of Mobile*, 978 F.2d 1214 (11th Cir. 1992).  The federal courts in Arkansas have divided on this issue. *Compare Matthews v. Jefferson*, 29 F. Supp. 2d 525 (W.D. Ark. 1998), *and Allen v. Morris*, 2010 WL 1382116 (E.D. Ark. 2 April 2010), *with Westfall v. Parkstone Place Retirement Center*, No. 4:02-cv-254-GTE (E.D. Ark. 2 May 2003).

**21.**  Judge Waters's careful opinion in *Matthews* analyzes this issue thoroughly.  This Court is persuaded by that opinion and adopts its reasoning.  With respect to Judge Eisele's unreported order awarding damages in the *Westfall* case, which is Meagley's principal authority here, that order reaches the conclusion Meagley seeks but it does not analyze the law.

**22.** "The rights, procedures, and enforcement remedies under Title II [of the ADA] are the same as under section 504." *Layton*, 143 F.3d at 472.  And

"[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [section 504 of the Rehabilitation Act]."   29 U.S.C.A. § 794a(a)(2) (West Supp. 2010); *see also Barnes v. Gorman*, 536 U.S. 181, 185 (2002). In *Guardians Ass'n v. Civil Service Commission of City of New York*, a majority of the Justices held, in an otherwise fractured decision, that proof of discriminatory intent is required before compensatory relief is available in Title VI cases.  463 U.S. 582, 607 n.27 (1983); *see also Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001).  Following this reasoning, the Court concludes as a matter of law that Meagley must prove intentional discrimination before she can receive compensatory damages for the Zoo's violation of section 504 of the Rehabilitation Act and Title II of the ADA.

**23.**  Deliberate indifference is the appropriate standard in this kind of case for intentional discrimination.  *Barber*, 562 F.3d at 1228–30; *Loeffler*, 582 F.3d at 275–76.  "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

Here Meagley's proof fails.  There is no evidence that the Zoo knew that the two bridges near the siamang exhibit did not comply with the ADA and yet failed to correct the problem.  The proof showed just the opposite.  Chilcote's evaluation in the late 1990s did not note any ADA problems with the bridges. Before Meagley, no Zoo patron had ever turned over in a scooter on the bridges.  And after getting the Renshaw Firm's report, which found that the bridges' slopes were too steep, the Zoo altered the bridges to make them flat. Because she has failed to prove that the Zoo intentionally discriminated against her, Meagley cannot recover compensatory damages for the Zoo's ADA/Rehabilitation Act violation.

**24.**  Meagley presses that discriminatory intent is not required.  She makes a nuanced argument from the statutory relationship between the Rehabilitation Act, the ADA, Title VI of the Civil Rights Act of 1964, and the Supreme Court's precedent about implied causes of action.  Meagley's bottom line seems to be this: the different sources of the Congress's authority to enact the Rehabilitation Act (the Spending Clause) and the ADA (the Fourteenth Amendment) determine whether discriminatory intent is required; and under

the ADA, a discriminatory effect (the too-steep bridges) is sufficient proof of discriminatory intent.

**25.**  The Court is not persuaded.  Section 504 of the Rehabilitation Act and Title II of the ADA are—by settled precedent—inextricably tied together. The remedies available under section 504 of the Rehabilitation Act are the same as those available under Title VI of the Civil Rights Act of 1964.  Though divided on other related issues, the Supreme Court has said that compensatory relief in Title VI cases must stand on proof of discriminatory intent.  Therefore, compensatory damages in cases brought under section 504 of the Rehabilitation Act and Title II of the ADA must likewise stand on proof of discriminatory intent.  Because the Zoo was not deliberately indifferent to ADA problems with the bridge, Meagley proved no such intent.

**26.**  Meagley also argues that the rental fee charged by the Zoo for the scooter was an impermissible surcharge.  This is the first new issue that arose at trial.  The governing regulation provides that

> [a] public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to

provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

28 C.F.R. § 35.130(f).

**27.**  The City responds that neither the ADA nor the Rehabilitation Act requires the Zoo to provide electric scooters.  Thus, according to the City's reasoning, there can be no illegal surcharge because providing a scooter is not "required" by the regulation.  The City is right.

**28.**  The Zoo's scooter-rental program goes above and beyond its general obligation under the ADA to make its services, programs, and activities accessible to its disabled patrons.  To that end, the Zoo continuously monitors itself to ensure that it complies with the ADA's accessibility requirements and corrects accessibility problems in the Zoo's facilities as they arise.  Terri Branson, a Zoo employee, gave unequivocal testimony that scooters are available for rent to every adult who visits the Zoo regardless of whether the visitor is disabled.  Disabled visitors are not required to rent one of the Zoo's scooters; they can bring their own scooter or wheelchair and use it without being charged to do so.  If Meagley had proven that a scooter was essential to access, that the Zoo charged only disabled people for the scooters and forbade

non-Zoo scooters on the premises, then the Zoo might well have a problem under *Klingler v. Director, Dep't of Revenue, State of Missouri*, 433 F.3d 1078 (8th Cir. 2006). But that is not this case. Considering all the circumstances, the Zoo's fee for renting a scooter is not an illegal surcharge. *Disabled in Action of Pennsylvania v. National Passenger Railroad Corp.*, 418 F. Supp. 2d 652, 658 (E.D. Penn. 2005).

**29.** Meagley raised a second new issue at trial: the Zoo now requires that all those who use scooters at the Zoo sign a release waiving tort liability. First, these waivers—one for renters and one for visitors who bring their own scooter—do not try to cover ADA/Rehabilitation Act claims. Second, Meagley's insurmountable problem here is standing.

**30.** "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). Meagley was not required to sign a waiver. The Zoo started using these forms after her accident. To establish standing, Meagley relies on her testimony that she plans to come back to Little Rock if the city is accessible

and safe.  She did not testify, however, whether she intends to return to the Zoo.  Even so, "[i]ntent to return to the place of injury 'some day' is insufficient."  *Steger*, 228 F.3d at 893 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)).  Meagley has not established an injury-in-fact, and thus has no standing to challenge the Zoo's new waivers.

\* \* \*

**31.**  Meagley proved, without question, that the City violated her rights under both Title II of the ADA and section 504 of the Rehabilitation Act.  The steep-sloped bridge where Meagley's accident occurred did not comply with the ADA Accessibility Guidelines.  The bridge made the siamang exhibit—one of the Zoo's activities—unavailable to Meagley because of her disability.  But her claims for relief (both injunctive and compensatory) based on this violation fail.  Meagley's claim that the scooter-rental fee is an improper surcharge is likewise unavailing.  And she lacks standing to pursue her claim about the waiver.  Because Meagley has not secured a judgment in her favor or a court-ordered consent decree, she is not a "prevailing party" entitled to attorney's fees. *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of*

*Health & Human Resources*, 532 U.S. 598, 605–06 (2001).   The Court must

therefore enter judgement against her in all respects.

So Ordered.

*DP Marshall Jr.*
_____

D.P. Marshall Jr.
United States District Judge

<u>13 August 2010</u>